**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **DEBORAH L. NAGY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION FILE NO:** |
| **v.** ) | **5:16-CV-70-MTT** |
| ) | |
| **TAYLOR COUNTY SCHOOL DISTRICT and** ) | |
| **GARY GIBSON,** ) | |
| ) | |
| **Defendants.** ) | |
| ————————————————————) | |

## ORDER

Plaintiff Deborah Nagy, a Caucasian female, brings this action against Defendants
Taylor County School District (the "School District") and Gary Gibson, alleging violations
of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. §
1981. Doc. 1 ¶ 1. Nagy also alleges a First Amendment retaliation claim as well as
state law tort claims against Gibson. *See generally id.* Defendants have moved for
summary judgment pursuant to Federal Rule of Civil Procedure 56. Doc. 18. For the
following reasons, the motion is **GRANTED**.

## I. BACKGROUND

Nagy began working for the School District in 1995 as an elementary school
teacher. Docs. 1 ¶ 8; 24-6 at 16:21-25, 17:8-11. Nagy continued to work as a teacher
until 2003 when she was promoted to a principal position in charge of grades three
through five. Docs. 18-5 ¶ 2; 24-6 at 19:5-8. Her duties as principal included the
following: (1) overseeing facilities operations at her school; (2) providing instructional
leadership; (3) handling student discipline; (4) supervising staff and ensuring they comply

with school procedures, guidelines, and Taylor County Board of Education policies; (5) attending school functions; and (6) attending Board meetings and reporting to the Board regarding significant activities at her school.   Docs. 18-5 ¶¶ 5-7; 24-6 at 20:11-20, 22:3-19, 25:14-26:7.

For the 2004-2005 school year, the School District opened a new school for kindergarten through second grade, and Nagy became and remained its principal until she resigned following the 2014-2015 school year.   Docs. 18-5 ¶¶ 3-4; 24-6 at 19:15-20:8.   At the time Nagy became a principal, the Superintendent of the School District was Wayne Smith.   Docs. 18-5 ¶ 8; 24-6 at 32:21-25.   In early 2013, Smith announced that he intended to retire.   Docs. 18-5 ¶ 9; 24-6 at 35:7-9.   At a Board meeting on May 13, 2013, Nagy expressed her interest in Smith's position as the District Superintendent, although Nagy never officially applied.   Docs. 18-5 ¶¶ 10, 12; 24-6 at 35-19-22, 42:20-25.

In late 2013, the School District hired Defendant Gary Gibson, a Caucasian male, to replace Smith.   Docs. 24-6 at 54:2-5, 67:24-68:1; 27 at 22:3-6.   At a December 9, 2013 Board meeting, Smith announced that the Board had "made the right choice" in hiring Gibson, a sentiment Nagy apparently did not share.   Docs. 18-3 at 2-3; 24-6 at 54:6-9.   Nagy was present at this meeting and sent a text to a work colleague that Smith's statement "pissed [her] off."   Docs. 18-3 at 2-3; 18-5 ¶ 15.   Gibson began work on January 1, 2014, and four months later, Nagy looked into a Superintendent position in Chattahoochee County but never applied for the position.   Docs. 18-5 ¶¶ 13, 16; 24-6 at 61:1-9, 66:18-67:3.   Nagy did, however, apply for a position as Superintendent, Curriculum Director, and Principal in Schley County because she "could tell things were

getting tense with Dr. Gibson at the end of [the 2013-2014 school] year." Doc. 24-6 at 63:20-25, 66:18-22, 67:1-8.

This tension arose when Gibson "began changing and formalizing the School District's hiring process" shortly after being hired, despite Nagy already having a process of her own in place for her school. Doc. 18-5 ¶ 18; *see also* Docs. 24-2 ¶¶ 6-9; 27 at 36:1-40:1. For her hiring process, Nagy typically selected the lead teachers from each grade level, the literacy coach, and sometimes the special education teacher to serve on a hiring committee that consisted of five to six members, including herself. Doc. 24-6 at 80:14-25, 116:16-25, 117:11-14. All members of her typical hiring committee, except the lead kindergarten teacher who was African-American, were Caucasian. *Id.* at 118:14-119:20. But Gibson believed the School District's faculty did not adequately represent the diversity in the student body, which is approximately 47% African-American. Docs. 18-5 ¶ 20; 24-6 at 75:22-25. Thus, he instituted a hiring procedure that required the appointment of hiring committee members to "reflect the community." Docs. 18-5 ¶ 21; 27 at 36:17-37:10. This meant that the hiring committee should "come from all facets of the school: [m]ale, female, race." Doc. 27 at 37:4-9. Thus, the community at large would feel "like they had input." *Id.* at 53:11-22.

In the Spring of 2014, Gibson verbally explained his new hiring procedure to all principals, allegedly including Nagy, at an administrative meeting. Docs. 18-4 ¶ 4; 18-5 ¶ 23. Nagy, who was a principal at the time, testified that she is not "sure if [Gibson] brought up the hiring policy then." Doc. 24-6 at 74:11-16. But she stopped short of stating "he didn't say anything [regarding the hiring procedure]," and admitted that "it was written in policy in the middle of October." *Id.* at 79:24-25. Notably, Gibson

maintained that in both his verbal instruction and the written memorandum of the hiring procedure, he mentioned "nothing about quotas or percentages." Doc. 27 at 38:18-20.

Following the 2013-2014 school year, Nagy went on medical leave, and Gibson assigned Gwen Jenkins, an African-American assistant principal at the upper elementary school, to fill in at the lower school during Nagy's absence. Docs. 24-2 ¶ 12; 24-6 at 97:18-98:2. This "bothered" Nagy because she believed Ellen Peacock, her predecessor, would have been a more qualified substitute. Doc. 24-6 at 98:13-99:10. However, because Peacock had retired, she could only have worked part time as principal or else she would have lost her retirement benefits. *Id.* at 100:7-12; Doc. 27 at 58:5-18. Thus, Gibson reasoned that having Jenkins working full-time as principal would be better than Peacock working part time, especially given Peacock was already working part-time at the central office. Doc. 27 at 58:14-25.

At the beginning of the 2014-2015 school year, an administrative assistant position opened up at Nagy's school. Doc. 27 at 59:7-16. Though Nagy was still on medical leave, she came back to handle the hiring process. Doc. 24-6 at 78:5-14, 93:15-23. With the "same criteria [she] always used," Nagy assembled a hiring committee that consisted entirely of Caucasian staff members.[1] *Id.* at 79:2-3; Doc. 24-2 ¶ 14. When the all-Caucasian hiring committee decided in favor of a white applicant, an African-American interviewee filed an EEOC complaint alleging race discrimination. Doc. 24-6 at 78:15-18, 96:21-24. The School District later settled this claim. Docs. 18-5 ¶ 27; 21 at 4.

---

[1] It is unclear why this committee did not include the African-American lead kindergarten teacher. *See* Doc. 24-6 at 118:14-23. Regardless, what is undisputed is that Nagy assembled an all-Caucasian hiring committee.

In September of 2014, while Nagy was still on leave, Gibson met with Nagy to discuss the EEOC claim and her failure to follow his hiring procedure.[2]   Docs. 24-6 at 84:5-13, 94:8-19, 95:1-14; 27 at 73:21-25.   During this meeting, Nagy claims Gibson "pretty much blamed [her] for [the EEOC] lawsuit," and Nagy, in turn, "questioned [Gibson] about his hiring process."   Docs. 24-2 ¶ 15; 24-6 at 152:15-24.   Initially, Gibson believed that a verbal instruction of his hiring procedure "would suffice," because he was "trying to let [the Principals] do [the hiring process] as much on their own as [he] could."   Doc. 27 at 37:20-24, 73:7-10.

On October 10, 2014, Gibson sent to the principals a written memorandum detailing the hiring procedure.   *Id.* at 50:15-51:9.   The memorandum stated that "the Interview Committee must be composed of differing genders, races, ages, and reflect the community we serve."   Doc. 24-6 at 83:8-84:2.   While Nagy stated the hiring procedure mentioned a quota, that word did not appear in the October 10, 2014 memo.   *Id.* at 85:10-16.   However, Nagy testified that she was told either verbally or in a subsequent memo that 40% of people on hiring committees had to be minorities.   *Id.* at 87:7-14. But Nagy admitted Gibson never told her she needed to hire a certain person based on race or gender.   *Id.* at 88:3-10.   Gibson also never told Nagy to include specific people in her hiring committee.   *Id.* at 195:3-5; Doc. 27 at 60:1-8.

---

[2]  While Nagy states in her brief and statement of material facts that she did not know about Gibson's hiring procedure until October of 2014, her deposition testimony is much more equivocal.   *See* Docs. 24 at 6; 24-1 at 3; 24-6 at 78:19-22, 79:15-25, 161:1-25.   Also, Nagy states in her affidavit that "[n]o *formal* quota requirement for hiring was implemented in Taylor County until October of 2014."   Doc. 24-2 ¶9 (emphasis added).   By using the word "formal," Nagy seems to suggest that Gibson's instructions to the principals in the Spring of 2014 regarding his hiring procedure were somehow informal and need not be followed unless they were in writing.   *See id.*; Doc. 24-6 at 78:19-22.   The relevant point, however, is that Gibson objected to Nagy's handling of the hiring process and what he viewed to be Nagy's failure to follow his procedures.   Docs. 18-5 ¶ 28; 24-6 at 10-17.

Near the end of 2014, a teacher position became vacant.   Doc. 24-2 ¶ 16.   For this position, Nagy followed Gibson's hiring procedure in assembling her hiring committee.   *Id.*   The committee consisted of three African-American staff members and three Caucasian staff members, including Nagy.   *Id.*   Unlike previous occasions, the committee members used score sheets to determine the top candidate.   *See* Doc. 24-6 at 115:1-13.   After all the score sheets were filled out, a Caucasian member collected the sheets and left the room to tally the scores.   *Id.* at 113:19-21.   When a white applicant was announced as the top candidate, "there was a great deal of dissension by the committee members along racial lines."   Doc. 18-4 ¶ 5.   The African-American members accused the Caucasian members of improperly calculating the scores.   Doc. 24-2 ¶ 17.   In turn, Nagy accused the African-American members, one of whom was Gwen Jenkins, of "erasing tally sheet scores in an effort to benefit the black candidate they favored."   *Id.* ¶ 18.   Gibson was informed of the accusations from both sides.   Doc. 27 at 76:1-11.   When Gibson met with Nagy to discuss this incident, Nagy claims "Gibson refused to hear [her] complaint about this process, and instead blamed [her] for the tally sheet tabulation dispute."   Doc. 24-2 ¶ 19.   Nagy testified that she did not have these issues until Gibson became the Superintendent.   Doc. 24-6 at 123:14-21.   But Gibson "tried to explain to [Nagy] how [the incident] could have been avoided if the scores were tallied in the room with the rest of the committee."   Doc. 18-5 ¶ 38; *see also* Doc. 18-4 ¶ 6.   Moreover, he doubted Nagy's claims because he stated that staff members inspected the black members' score sheets and there were no erasure marks.   Doc. 27 at 77:13-22.   While Gibson was attempting to explain these concerns, Nagy walked out of Gibson's office, "as she did in other meetings with Dr.

Gibson when he was critical of her performance." Doc. 18-4 ¶ 6; *see also* Doc. 18-5 ¶ 40. Thus, Gibson believed Nagy was being "openly defiant and rude." Doc. 18-5 ¶ 41.

Gibson alleges several other instances where Nagy exhibited "disrespectful and insubordinate" behavior. *See, e.g., id.* ¶¶42-49; Doc. 27 at 79:20-25. For example, Nagy would sometimes refuse to go to the podium in board meetings to address the Board and provide a report from her school. Docs. 18-5 ¶ 42; 27 at 81:13-82:4. This behavior, Gibson alleges, had led some Board members to tell him to "get her to the podium or [they were] going to do something about it." Docs. 18-5 ¶ 43; 27 at 82:2-4. Nagy also allegedly conversed with people around her in an audible tone while the Board meeting was taking place. Docs. 18-5 ¶ 44; 27 at 79:22-23. Further, Gibson claims Nagy was dismissive with parents and unwilling to assist in the school office, as "parents and staff often found her sitting in a rocking chair or on a counter in the front office." Doc. 18-5 ¶¶ 45-46; *see also* Doc. 27 at 106:19-25. In another instance, two officers of the school's PTO allegedly came to the front office and were ignored by Nagy for some time until she finally gave them the information they were seeking. Docs. 18-5 ¶¶ 47-49; 27 at 80:10-12, 106:19-25.

While Gibson never gave Nagy written notice of discipline for her behavior, as that was objected to by some board members and was not "the culture around [the school]," he testified that he disciplined her verbally. Doc. 27 at 114:17-116:9. Nagy claims Gibson never spoke to her about being insubordinate or unprofessional. Doc. 24-2 ¶ 11. Instead, she claims Gibson rarely spoke to her at all, and whenever he did, it would be in the presence of one or more of his staff as an attempt to intimidate her. Doc. 24 at 8. Gibson denied ever turning Nagy down when she wanted to meet but admitted he

had witnesses in the room whenever he was talking with Nagy, not to intimidate her but "[b]ecause things would . . . not be exactly as they were when they were repeated." Doc. 27 at 125:16-24.

In the Spring of 2015, Nagy applied for the position of Curriculum Director.    Doc. 24-6 at 192:5-6.    On April 1, 2015, Nagy was informed by the assistant superintendent that she was not selected for the position.    *Id.* at 192:8-11, 24-25, 193:1-4.    "According to [Gibson's] EEOC Rebuttal," Nagy "scored 7 out of 9" on the rubric from the committee. *Id.* at 192:19-23.    Nagy believes Gibson purposely put custodians and administrators on the hiring committee who are "all loyal to Gibson" in an effort to deny her the position.[3] Docs. 24-1 at 7; 24-6 at 196:7-19.    Minutes after hearing that she was not selected, Nagy called Gibson and initiated a heated confrontation.    Doc. 24-6 at 194:3-17. Specifically, Nagy admitted to saying something to the effect of "you better get ready, you're not going to be there much longer, I'm coming after you, you need to get your stuff together."    *Id.* 194:10-14.    Gibson determined the following morning that Nagy "could not continue to serve as a principal after the school year ended."    Doc. 18-5 ¶ 55; *see* Doc. 27 at 128:15-129:1.

The next Board meeting was on April 13, 2015, and as noted, Gibson required all principals to give a short report at Board meetings.    Docs. 24-6 at 219:10-16; 27 at 81:10-17.    Nagy stated she wanted to address the Board "to discuss some of [her] . . . concerns . . . about the system and the children, and the way things were being run." Doc. 24-6 at 217:18-218:1.    In her report, Nagy discussed her years in the School

---

[3]  At her deposition, Nagy had contradictory testimony regarding whether Gibson assembled hiring committees because in two instances she claimed he did while in another two instances she admitted to not knowing.   Doc. 24-6 at 197:5-11.   In the end, Nagy stated that she did not know "a hundred percent . . . that he picked any committees."   *Id.* at 197:11-13.   Thus, her assertion that Gibson selected "loyal" committee members seems based purely on speculation.

District, the excellent "climate" rating of her school, her health issues, and how she cared for her students and her school. *Id.* at 220:10-221:4. Additionally, Nagy asked what qualifications were required for Gibson's hiring committees at a District level, because she had unsuccessfully requested twice to be on one. *Id.* at 222:1-9. Nagy also asked how some decisions were being made by the central office. *Id.* at 227:4-9. Nagy testified that she wanted eventually to voice her opposition to Gibson's programs, but Gibson cut her off before she could finish. *Id.* at 224:2-9, 228:4-5.

Up to this point, Nagy stated she "had no idea" that she would not return as a principal. *Id.* at 224:14-16. On April 14, 2015, Nagy received a letter stating that her contract as a principal would not be renewed for the 2015-2016 school year. *Id.* at 198:18-22. Instead, the letter offered Nagy a teaching position, an offer Nagy rejected. *Id.* at 198:23-199:20, 201:23-202:1. The Board, with Gibson's recommendation, voted to replace Nagy with an African-American female, Gwen Jenkins, the assistant principal who filled in during Nagy's medical leave. *Id.* at 202:2-6. The Board that voted on Nagy's nonrenewal consisted of three Caucasian members and two African-American members. Docs. 18-5 ¶ 64; 24-6 at 203:13-16. At the same time as Nagy's nonrenewal, the Board filled another principal position with a Caucasian. Docs. 18-5 ¶¶ 61-63; 24-6 at 202:7-203:9.

On September 19, 2016, the Board voted to remove Gibson as Superintendent. Doc. 27 at 87:11-15. During his time as the School District's Superintendent there were 32 hires, most of whom were teachers. *Id.* at 85:9-16. Of the teacher hires, the "majority by far was [C]aucasian." *Id.* at 86:1-8.

On June 8, 2015, Nagy filed a charge of discrimination with the EEOC and received a Right-to-Sue notice.   Doc. 1 ¶ 14.   Nagy timely filed this lawsuit alleging claims against the School District and Gibson pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I), and 42 U.S.C. § 1981 (Count II).   *See generally* Doc. 1 ¶ 1.   Nagy alleges that, despite her "stellar record as Principal of the Primary School," the determining factor in Defendants' decision to demote and constructively terminate her as the Primary School Principal was her race.   *Id.* ¶¶ 13, 16, 19.   Nagy also asserts a First Amendment claim against Gibson (Count IV), alleging Gibson demoted her in retaliation for her speaking on matters of public concern, and state law claims for defamation (Count III) and intentional infliction of emotional distress (Count V).   *Id.* ¶¶ 22, 24, 26.

## II. <u>Discussion</u>

### A.    Summary Judgment Standard

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"   *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "The moving party bears the burden of proving no genuine issue of material fact exists."   *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.   The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."   *Id.* (quoting Anderson, 477 U.S. at 249-50).   Further, where a party fails to address another party's assertion of fact as required by Rule 56(c), the Court may consider the fact undisputed for purposes of the motion.   Fed. R. Civ. P. 56(e)(2).   However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."   *Anderson*, 477 U.S. at 255.

## B.   Nagy's Inadequate Response to Defendants' Statement of Undisputed Material Facts

Defendants argue that "in the vast majority of [Nagy's] responses to Defendants' Statement of Undisputed Material Facts ("SMF"), Plaintiff either does not directly refute the facts or supports her refutations with conclusory disagreements or evidence that does not actually directly refute the fact."   Doc. 28 at 2 (internal quotation marks omitted).   There is considerable merit to Defendants' allegation.   Here are but a few examples.   Defendants rely on the affidavit of Latonja Turner, the woman to whom Nagy texted that Smith's endorsement of Gibson "pissed [her] off."   Doc. 18-3.   Turner attached to her affidavit a screen shot of those messages.   *Id.* at 3.   Nagy responds by

simply stating she "has no recollection of this text message exchange, or of the date of any such alleged communication." Doc. 24-1 at 2. In response to Defendants' assertion that Nagy "walked out of Dr. Gibson's office as he was attempting to explain his concerns . . ." (Doc. 18-5 ¶ 40), Nagy simply "denies this incident took place as related by Gibson and Albritton." Doc. 24-1 at 6. And in response to the assertion that Nagy told Gibson "that she was going to 'get' him and that he should 'pack his office' because he was going to lose his job" (Doc. 18-5 ¶ 54), Nagy "denies that her conversation with Dr. Gibson was as alleged by Dr. Gibson." Doc. 24-1 at 7-8. Yet, Nagy testified:

> Q:    Do you remember saying, you better get ready,
>       you're not going to be there much longer, I'm
>       coming after you, you need to get your stuff
>       together?
>
> A:    I don't know if those were my exact words, but I
>       said something to that effect, yes.
>
> Q:    Okay. So you had a heated confrontational
>       conversation with him?
>
> A:    Yes.

Doc. 24-6 at 194:10-17. Again, these are illustrative examples, not an exhaustive list. Others are noted throughout this Order.

Clearly, Nagy has not met her obligations under Rule 56(c) and this Court's Local Rule 56 requiring "[a]ll material facts contained in the movant's statement [to be] specifically controverted by specific citation to particular parts of materials in the record." Accordingly, Defendants ask the Court to deem these facts admitted. Doc. 28 at 2. While this Court could simply take the relevant, asserted undisputed facts as true, the

Court's review of the record confirms that the undisputed facts establish that Defendants are entitled to summary judgment.[4]

## C.     Race Discrimination Claim under Title VII and Section 1981

Nagy alleges that Defendants discriminated against her on the basis of her race in violation of Title VII and § 1981.   Doc. 1 ¶ 1.   "Sometimes this type of claim, where a white employee alleges to be the victim of discrimination, is referred to as a 'reverse discrimination' claim."   *Bass v. Bd. of Cty. Comm'rs*, 256 F.3d 1095, 1102-03 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) ("Discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim.").   Regardless of rhetoric, Title VII and § 1981 both prohibit discrimination based on *any* race.   *See* 42 U.S.C. §§ 2000e-2(a), 1981; *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280, 287 (1976) (holding that Title VII prohibits discrimination against whites as well as non-whites and that § 1981 also "applies to [a]ll persons, including white persons.") (internal quotation marks and emphasis omitted). As such, "[b]oth Title VII and § 1981 have the same requirements of proof and present the same analytical framework."   *See Springer v. Convergys Customer Mgmt. Group*

---

[4]  Nagy's misrepresentation of the record is not limited to her response to Defendants' statement of undisputed facts.   In her statement of material facts, she alleges that Gibson "spoke at black churches to advocate his presence as a reformer who was going to bring justice to the black community in Taylor County."   Doc. 24-1 at 10.   But the affidavit Nagy cites to support this assertion states:

> During Gibson's first few months in the school district, I took him to many of the community churches to introduce him, including to St. Phillips African Methodist Episcopal church, a church with a black church membership in Butler, Georgia.   I was present when Gibson started singing with the congregation at St. Phillips and at other churches, and when he spoke to St. Phillips and other black churches in Butler and in Taylor County, I heard him tell those congregations that he was going to be their leader as the head of the school system and that he was going to make changes to benefit their communities.

Doc. 24-3 ¶¶ 6-7.

*Inc.*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007) (citation omitted).    This Court will therefore address Nagy's Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.

### 1.    Title VII Framework

To establish a claim under Title VII, a plaintiff may present either direct evidence of discrimination or circumstantial evidence that creates an inference of discrimination.[5] *Yili Tseng v. Florida A&M Univ.*, 380 F. App'x. 908, 909 (11th Cir. 2010).    Nagy does not rely on *McDonnell Douglas* and "is not relying on circumstantial evidence of violations of Title VII or of § 1981."    Doc. 24 at 13.    Instead, she argues that she has shown "direct evidence of adverse employment action taken against her where race was the motivating factor."    *Id.*    The Court disagrees.    Direct evidence of discrimination is "evidence which, if believed, would prove the existence of a fact in issue without inference or presumption.    Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of race . . . constitute direct evidence of discrimination."    *Bass*, 256 F.3d at 1105, *overruled in part on other grounds by Crawford*, 529 F.3d 961 (internal quotations, alterations, and citation omitted).    For example, an employer's statement that he wanted an African-American person to have a white employee's job is direct evidence that the white employee was terminated for racially discriminatory reasons.    *See Caban-Wheeler v. Elsea*, 71 F.3d 837, 842-43 (11th Cir. 1996).

Here, Nagy points to no such evidence showing discriminatory intent.    Certainly, there is no direct evidence that Gibson demoted Nagy because of her race or that he

---

[5]  A plaintiff may also use statistical proof to show a pattern and practice of discrimination.    *Buckley v. Hospital Corp. of Am., Inc.*, 758 F.2d 1525, 1529 (11th Cir. 1985).    However, such method is not argued by either parties in this case.

harbored racial animus against her.   There are no "blatant remarks" clearly demonstrating discriminatory intent.[6]   Rather, Nagy's "direct evidence" is that she was demoted because she opposed what she calls "quota systems" for hiring committee membership.   *See* Doc. 24 at 3, 6, 12.   However, Gibson never mentioned "quotas" or "percentages" in either his verbal instruction to the principals in the Spring of 2014 or the October 10, 2014 written memorandum; Nagy merely characterizes the hiring procedure as such.   Doc. 27 at 38:18-20.   A quota is defined as "a program in which a certain fixed number or proportion of opportunities are reserved exclusively for certain minority groups."   *Grutter v. Bollinger*, 539 U.S. 306, 335 (2003) (internal quotation marks and citation omitted).   In this case, it is undisputed that Gibson never told Nagy to hire someone based on race or gender, and he never told her to include certain people in the hiring committee.   Doc. 24-6 at 88:3-10, 195:3-5.   The fact that the hiring committee members are diverse does not mean that only African-Americans would be hired or that this was Gibson's intent.   Indeed, according to Gibson, during his time as the Superintendent, including when his hiring procedure was implemented, the majority of the 32 new hires was "by far Caucasian."   Doc. 27 at 86:1-8.   Thus, contrary to Nagy's assertion, the Court does not find unconstitutional or discriminatory a hiring procedure that requires a committee to "reflect the community" and be "composed of differing

---

[6] While Nagy claims in her statement of material facts, but not in her brief, that "Gibson was in communication with a black member of the Board of Education about finding a way to eliminate Nagy as an administrator during the months before his decision to terminate her," the affidavit of Dwight Harris to which Nagy cites for the proposition does not exist in the record.   Doc. 24-1 at 14.

Nagy also claims in her statement of material facts that "Gibson believed that Nagy represented the white establishment who were determined to hold on to 'power' in the Taylor County schools."   *Id.*   While Gibson did state at his deposition that he now believes "Nagy was trying to stay . . . in with the group that had the power for the last 200 years," this again does not directly relate to his decision to demote her.   Doc. 27 at 120:9-13.   In fact, Nagy never references this statement in her brief to argue there was direct evidence of discrimination.

genders, races, [and] ages," because this does not one-sidedly benefit a particular group.   Docs. 24-6 at 83:8-25-84:2; 27 at 36:12-37:24; *see Grutter*, 539 U.S. at 335-36 (noting that with respect to race-conscious university admissions programs, "[a] Law School's goal of attaining a critical mass of underrepresented minority students does not transform its program into a quota").   Simply put, even if Defendants demoted Nagy because of her opposition to a procedure that promotes diversity among members of hiring committees, that is not direct evidence of discriminatory intent.

To buttress her direct evidence argument, Nagy cites events that are "unrelated to the decisionmaking process itself," which "are not direct evidence of discrimination," and, for that matter, are not even indirect evidence of discrimination against Nagy.   *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998).   In addition to his requirement that hiring committees include minority members, Nagy alleges that Gibson wanted the school's football and basketball cheerleading squads to be racially diverse; that he donated his own funds to at least two black cheerleaders[7] for tumbling lessons so that they could perform with the football cheerleading squad;" and that he spoke at black churches "to advocate his presence as a reformer who was going to bring justice to the black community in Taylor County."[8]   Doc. 24-1 at 10.   Though Nagy, in a somewhat perfunctory manner, attempts to link these events to show that Gibson discriminated against her, these events clearly do not directly relate to Gibson's decision to demote Nagy and they are not direct evidence of racial animus.   At best, Nagy is asking this Court to draw an inference that race was the "root of the decision," or underlying reason,

---

[7]  This misrepresents the record.   At his deposition, Gibson stated that he and his wife paid for children, *both Caucasian and African-American*, who could not afford tumbling lessons.   Doc. 27 at 119:9-22.

[8]  As discussed above, this last allegation is also a distortion of the record.   *See supra* note 4.

for her demotion, because Gibson generally favored racial diversity.   That is not direct evidence of discrimination.

### 2.   *McDonnell Douglas* Framework

Even if Nagy had invoked the *McDonnell Douglas* circumstantial evidence framework, she still fails.   Pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly depending on the nature of the claim.   *See Wilson v. Bailey*, 934 F.2d 301, 304 (11th Cir. 1991).   If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).   This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.   *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

A plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination.   *Id.*   "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Texas Dept. for Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).   Put another way, "[a] plaintiff may . . . survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the

employer's legitimate, non-discriminatory reasons.'" *Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 925 (11th Cir. 2012) (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965 (11th Cir. 1997)). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000); *see Alexander v. Fulton Cty.*, 207 F.3d 1303, 1341 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) ("It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated.").

The plaintiff's burden at the pretext stage merges with her "'ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Burdine*, 450 U.S. at 256); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). Thus, the critical decision "is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (alteration in original) (quoting *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993) ("[P]roving the employer's reason false becomes part of (and

often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination.").

### i. Prima facie case

A plaintiff may create an inference of discriminatory demotion or termination by showing that "(1) he is a member of a protected group; (2) he was qualified for the position he occupied; (3) he was demoted or terminated; and (4) he was replaced by an individual outside of his protected class." *Gamble v. Aramark Unif. Servs.*, 132 F. App'x. 263, 267 (11th Cir. 2005). Nagy is Caucasian, was qualified to be a principal, was in fact demoted, and was then replaced by an African-American employee. Despite Nagy's disavowal of the *McDonnell Douglas* framework, the Court will assume that she has carried her burden of establishing a prima facie case and consider whether she has shown that Defendants' proffered nondiscriminatory reasons for demoting her are pretextual.

### ii. Legitimate Nondiscriminatory Reasons

Defendants argue that Gibson demoted Nagy due to her "unprofessional and insubordinate" behavior. Doc. 18-1 at 9. Specifically, they cite Nagy's:

> (1) failure to follow [Gibson's] hiring procedure or conduct the hiring process in a manner that maintains the perception of integrity to the process; (2) openly defiant, rude behavior in meetings, including Board meetings; (3) failure to be responsive to parents who needed information or assistance at her school; and most significantly, (4) threatening Gibson that she would get him fired after she did not get the Curriculum Director position she sought, even though he was not on the hiring committee that rejected her application.

Doc. 18-1 at 9. Clearly, these are reasons that might motivate a reasonable employer. *See Chapman*, 229 F.3d at 1030. In addition, it is undisputed that Nagy and Gibson

"were at odds . . . from the beginning of his time as superintendent."   Doc. 24 at 4.

From Nagy sending a text message to a colleague that Smith's statement regarding

Gibson being the right choice as Superintendent "pissed [her] off" to Nagy being

"bothered" that Jenkins would fill in during her medical leave rather than Peacock, and

from Gibson being "not happy" at Nagy for the EEOC claim to Gibson dismissing Nagy's

complaint about the tally sheet tabulation dispute, the evidence is undisputed that Nagy

and Gibson had a poor working relationship.   Docs. 18-3 ¶ 2-3; 24-2 ¶ 19; 24-6 at

98:13-22, 194:10-14; 27 at 74:21-23, 77:13-22.   Indeed, Nagy's admitted threat, made

during a heated confrontation, that she would get Gibson fired seems justification

enough for her demotion.   In any event, it is clear that Defendants have advanced

legitimate nondiscriminatory reasons for their actions.

### iii.    Pretext

Because Nagy does not rely on *McDonnell Douglas*, she does not address pretext

in that context.   She does argue that "Gibson's proffered reasons for terminating Nagy

are not true."   Doc. 24 at 14.   She "denies that Gibson ever talked to her about her

alleged unprofessional conduct or insubordination."   *Id.*   Nagy also claims that "[t]he

only evidence relied on by Defendants to support the proffered reasons is Gibson and

his testimony."   *Id.*   As an initial matter, Nagy's "self-serving assertion that she was not

insubordinate does not alone demonstrate" that her demotion was in fact motivated by

race.   *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (similarly

holding that a plaintiff's "self-serving assertion that she was not insubordinate does not

alone establish that she was terminated because of her sex").   Clearly, Nagy's

arguments amount to "quarreling," and she has failed to meet *each* of Defendants' reasons "head on and rebut it." *Chapman*, 229 F.3d at 1030.

Additionally, Nagy's claim that Defendants' only evidence of their legitimate nondiscriminatory reasons was Gibson himself is simply not true. Nagy herself admits many of the facts upon which Gibson based his decision, most notably her threats and confrontation. Doc. 24-6 at 194:10-17. Defendants also provide Jennifer Albritton's affidavit confirming Gibson's proffered reasons, such as when Nagy would walk out of meetings with Gibson.[9] Doc. 18-4 ¶ 6.

In any event, the "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and . . . not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266. Thus, the "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Robinson v. Colquitt EMC*, 651 F. App'x. 891, 894 (11th Cir. 2016) (internal quotation marks and citation omitted). Nagy's belief that Gibson "is not a credible witness" does not negate Gibson's honest belief that Nagy had engaged in insubordinate or unprofessional conduct that damaged their working relationship.[10] Doc. 24 at 14.

---

[9] As noted, Nagy, in response to Defendants' statement of undisputed material facts, simply "denies this incident took place as related by Gibson and Albritton." Doc. 24-1 at 6. In addition, Nagy states in her affidavit that "Albritton's testimony on these issues [of unprofessional and insubordinate behavior] is not credible." Doc. 24-2 ¶ 31. Clearly, there is evidence of Defendants' legitimate nondiscriminatory reasons other than Gibson himself.

[10] Defendants also argue that "[i]t is extremely difficult for a plaintiff to establish discrimination where the allegedly discriminatory decision-makers are within the same protected class as the plaintiff." Doc. 18-1 at 11 (quoting *Norris v. City of Flovilla*, 2017 WL 902866, at *5 (M.D. Ga.) (internal quotation marks and citation omitted)). Here, Gibson is Caucasian, and the School District's Board that voted not to renew Nagy's contract as a principal was comprised of three Caucasian members and two African-American members. Doc. 18-5 ¶ 64. The Court also notes that it is extremely difficult for a plaintiff to establish discrimination when decisionmakers hire those within the same protected class as the plaintiff to work in similar positions that the plaintiff once held. That is what occurred here. While an African-American employee replaced Nagy's specific position, there was another principal position open in the upper elementary school. For that open position, Gibson hired a Caucasian. *Id.* ¶¶ 61-63.

Thus, Nagy has not "demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks and citation omitted). Therefore, Nagy has failed to demonstrate that Defendants' stated reasons for demoting her are in fact pretext for discrimination.[11] Accordingly, the Court concludes that no reasonable jury could find that Defendants' actions were discriminatory under Title VII or § 1981.

## D. First Amendment Retaliation Claim against Gibson

"To state a claim that a [public] employer took disciplinary action in retaliation for constitutionally protected speech, a public employee must prove, as a threshold matter, that the employee spoke as a citizen on a matter of public concern." *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1281-82 (11th Cir. 2009) (internal quotation marks and citation omitted). If the answer is no, the employee has no First Amendment cause of action, and no further inquiry is necessary. *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007).

Here, Nagy broadly asserts that she "repeatedly and publically opposed Gibson's program to bring racial equity." Doc. 24 at 15. However, other than her presentation at the Board meeting on April 13, 2015, Nagy points to no concrete, specific example where she publically opposed his program. Nagy claims she spoke against Gibson in

---

[11] The Court recognizes that establishing the *McDonnell Douglas* elements is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith*, 644 F.3d at 1328. A plaintiff can always avoid summary judgment by creating a triable issue concerning the employer's discriminatory intent. A plaintiff can do this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). However, Nagy has not presented "a convincing mosaic of circumstantial evidence" that Defendants acted with discriminatory intent.

the presence of staff and administration as well as in the community and with Board members; however, she cites no evidence in the record supporting this general claim. *Id.* Thus, the only "speech" that merits discussion of First Amendment protection is her Board meeting presentation on April 13, 2015.

Gibson first raises what is in effect a causation argument. He argues that because he decided not to renew Nagy as a principal on April 2, 2015, the morning after she admittedly threatened him, he could not have retaliated against her for a speech that occurred eleven days later. Doc. 18-1 at 13. The Court is not convinced. While Gibson may very well have believed at that time that he could no longer work with Nagy, there is no evidence in the record that Gibson took any action to remove her. In fact, Nagy testified that she "had no idea" that she would not return as principal until she received a letter of her nonrenewal on April 14, 2015, the day *after* she gave her presentation at the Board meeting. Doc. 24-6 at 198:18-22, 224:14-16. Thus, the Court cannot say as a matter of law that there is not a sufficient temporal link between Nagy's speech and her demotion.

Gibson next argues that Nagy's speech is not protected under the First Amendment because Nagy was not speaking as a private citizen but rather as part of her duties as principal. Doc. 18-1 at 13. The United States Supreme Court has made clear that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Lane v. Franks*, 134 S.Ct. 2369, 2376 (2014) (internal quotation marks and citation omitted). The Supreme Court has defined "speech made pursuant to an employee's job duties" as "'speech that owes its existence to a public employee's professional responsibilities'" and

"a product that 'the employer itself has commissioned or created.'" *Abdur-Rahman*, 567 F.3d at 1283 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006)).

Here, it is undisputed that one of Nagy's duties as principal was to attend Board meetings and present a report on significant activities at her school. Doc. 24-6 at 26:2-16. It is also undisputed that Gibson required all principals to give a report at each month's Board meeting. Doc. 27 at 81:10-17. Finally, Nagy admitted she attended school functions, including Board meetings, in her capacity as principal. Doc. 24-6 at 25:14-23. Thus, by her own admissions and in light of the purpose of these meetings to report significant activities at the school, Nagy's speech at the April 13, 2015 Board meeting was made pursuant to her official employment responsibilities. *See D'Angelo v. School Bd. of Polk Cty.*, 497 F.3d 1203, 1210-11 (11th Cir. 2007); *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 761 (11th Cir. 2006).

Notwithstanding her admissions, Nagy argues that her official duties did not require her to oppose Gibson. Doc. 24 at 15. But Nagy's "official employment responsibilities" required her to report significant activities at her school, including, but not limited to, any actions taken or programs implemented by the District Superintendent concerning her school. Even if "Gibson didn't tolerate opposition," this would not change the fact that Nagy had an official duty to report. *Id.* Put simply, though her reason for taking the microphone might have been eventually to speak against Gibson's programs (as discussed below she never got around to it), Nagy still had an official duty to discuss such issues with Board members. Accordingly, Nagy's speech at the April 13, 2015 Board meeting was not made in her capacity as a citizen but was made "for the purpose of fulfilling [her] assigned job duties," "owe[d] [its] existence . . . to [her] official

responsibilities[,] and cannot reasonably be divorced from those responsibilities." *Abdur-Rahman*, 567 F.3d at 1283 (internal quotation marks and citation omitted).

Gibson also argues that Nagy's Board meeting presentation is not protected speech because it was "about Plaintiff's years in the School District, the effects on her health, all of the things she had done and accomplished in her career for the District." Doc. 18-1 at 14. In essence, Gibson contends that the "main thrust" of Nagy's presentation was on matters personal to her, not of public concern. *Id.*; *see Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1304 (11th Cir. 2005) ("If the 'main thrust' of a public employee's speech is on a matter of public concern, then the speech is protected."). If the speech "in no way draws the public at large or its concerns into the picture," but rather deals with private matters, the speech is not protected. *Pearson v. Macon Bibb Cty. Hosp. Auth.*, 952 F.2d 1274, 1279 (11th Cir. 1992).

Nagy does not seem to dispute that she discussed personal matters at the Board meeting. Instead, her contention is that she wanted to begin by "telling [the Board] what all [she] had done in the last 20 years," and she could not discuss "some of the things [she] was concerned about" because "they cut [her] off after five minutes." Doc. 24-6 at 224:4-9. Nagy contends that one of the things she was concerned about was Gibson's "program of forcing racial equity on the schools." Doc. 24 at 15. However, even if Nagy had not been cut off and was able to discuss this concern, her speech would still be unprotected. Though diversity programs touch on an important matter of public interest, the main purpose behind her opposition to Gibson's program "was not to raise an issue of public concern, but rather to further her own private interest in improving her employment position." *Myles v. Richmond Cty. Bd. of Educ.*, 267 F. App'x 898, 900

(11th Cir. 2008) (noting that while plaintiff's complaint that unqualified people were being appointed to positions in the school district touched on an important matter of public interest, plaintiff "voiced her concerns as a disgruntled employee rather than as a citizen concerned about corruption"). In effect, Nagy's "concerns," including her professed concern about Gibson's "racial equity" program, amount to a personal grievance.[12] *See Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (holding that although the plaintiff "did speak about her co-worker's plight, which contains a public concern aspect, the main thrust of her speech took the form of a private employee grievance") (citation omitted). Accordingly, her speech cannot be afforded protection under the First Amendment.

Finally, Gibson argues that, as a public official, he "is entitled to qualified immunity since Plaintiff cannot argue that the law was clearly established that her speech was protected." Doc. 18-1 at 16. As an initial matter, "[t]o be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." *Gaines v. Wardynski*, 2017 WL 4173625, at *2 (11th Cir. 2017). Once the public official has satisfied this initial burden, the burden shifts to the plaintiff to establish that qualified immunity is not appropriate. *Id.* In this case, because Nagy does not dispute that Gibson was acting within the scope of his discretionary authority, she bears the burden to convince the Court that Gibson is not immune from suit.

A plaintiff may meet her burden by showing two things: "(1) that the defendant violated her constitutional rights, and (2) that, at the time of the violation, those rights

---

[12] At the Board meeting, Nagy discussed other matters that amount to a personal grievance. She asked what the qualifications were to be on Gibson's hiring committees at a District level because she had unsuccessfully requested twice to be on one. Doc. 24-6 at 222:1-9. She also asked how the central office made some of its decisions. *Id.* at 227:4-9. Both of these "concerns" seem to relate to her not getting the Curriculum Director position and her belief that Gibson selected committee members who are "all loyal to Gibson" in an effort to deny her the position. Doc. 24-1 at 7.

were clearly established in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks, alterations, and citation omitted). The Court "may decide these issues in either order, but, to survive a qualified-immunity defense, the plaintiff must satisfy both showings." *Id.* (internal quotation marks, alterations, and citation omitted). As discussed above, the Court already found that Nagy's speech was unprotected and that Gibson did not violate her First Amendment rights. In the alternative, even if the Court assumes that her rights were violated, Nagy cannot show that her rights were "clearly established" at the time of the violation.

A plaintiff may show that her rights were clearly established in one of three ways:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

*Terrell v. Smith*, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (internal quotation marks, alterations, and citations omitted). "The second and third methods are generally known as 'obvious clarity' cases." *Gaines*, 2017 WL 4173625, at *2. They refer to situations where "the words of the federal statute or constitutional provision at issue are so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful," or where an existing case law is so clear and broad "that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (internal quotation marks

and citation omitted). These obvious clarity cases "are rare." *Corey Airport Servs.,*

*Inc. v. Decosta*, 587 F.3d 1280, 1287 (11th Cir. 2009).

Here, it is not obvious that there was a violation of clearly established law under

the First Amendment. Nagy has failed to identify a case where a superintendent acting

under similar circumstances as Gibson was held to have violated the First Amendment.

In fact, Nagy fails to cite *any* authority to support her argument against qualified

immunity. Notwithstanding her failure to cite any existing precedent, Nagy contends

that Gibson had fair warning to know that "silencing [Nagy] for speaking her opposition to

his actions was unlawful." Doc. 24 at 16. The Court disagrees. The broad language

in the First Amendment does not make it so obvious or clear that Gibson's actions were

unlawful.[13] Moreover, Gibson's "silencing" her at the meeting was certainly not

egregious. Nagy never actually addressed her concerns about Gibson's program.

Instead, during her five-minute speech, Nagy discussed personal matters, such as "what

all [she] had done in the last 20 years" for the School System. Doc. 24-6 at 224:4-9.

Presumably, Nagy contends that Gibson should have known she would oppose his

program at the time he silenced her. No settled First Amendment principle requires a

superintendent to predict whether a principal may give a protected speech at a Board

---

[13] Defendants point out that after the Supreme Court's decision in *Hope v. Pelzer*, 536 U.S. 730 (2002), a plaintiff "is no longer required to cite cases with materially similar facts," but instead "must show that the state of the law was sufficiently established to give Gibson 'fair warning' that he acted unlawfully." Doc. 18-1 at 14-15. In effect, Defendants interpret the *Hope* decision as creating a "fair warning" standard but treat the "materially similar facts" as a separate standard. This is not entirely accurate. While *Hope* did create another method to determine "fair warning," as the 11th Circuit noted, "[t]here are *three* methods to show that the [public] official had fair warning," one of which is by showing a materially similar case. *Gaines v. Wardynski*, 2017 WL 4173625, at *2 (11th Cir. 2017) (emphasis added). The other two methods, known as "obvious clarity" cases, are the result of the *Hope* decision. *See id.*; *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (reaffirming its decision in *Hope* that no relevant case law is needed where a constitutional violation is clear and "obvious").

meeting, nor does it prohibit the act of "silencing" speech that cannot be anticipated.

Accordingly, Gibson is entitled to qualified immunity.

**E.     State Law Tort Claims**

Nagy has also asserted state law tort claims against Gibson for defamation and intentional infliction of emotional distress.   Doc. 1 ¶ 1.   However, because Defendants are entitled to judgment as a matter of law on the federal law claims, the Court declines to exercise supplemental jurisdiction over the state law tort claims.   *See* 28 U.S.C. § 1367(c)(3).

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 18) is **GRANTED**.   Accordingly, the Title VII and § 1981 claims, as well as the First Amendment retaliation claim, are **dismissed with prejudice**.   The Court declines to exercise supplemental jurisdiction, and, thus, the state law tort claims are **dismissed without prejudice**.

**SO ORDERED** this 5th day of October, 2017.


S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT